UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    -against-<br><br>ANDREEA DUMITRU,<br><br>                    Defendant. | 18-CR-243 (LAK) |

**MEMORANDUM OF LAW IN OPPOSITION
TO GOVERNMENT'S MOTION *IN LIMINE***

Justin M. Sher
Allegra Noonan
**SHER TREMONTE LLP**
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
jsher@shertremonte.com

*Attorneys for Andreea Dumitru*

Defendant Andreea Dumitru respectfully submits this memorandum of law in opposition to the Government's Motion *In Limine*.

## ARGUMENT

**I.  THE COURT SHOULD PERMIT MS. DUMITRU TO INTRODUCE EXPERT TESTIMONY CONCERNING THE PERSECUTION OF ROMA**

Ms. Dumitru seeks to introduce expert testimony concerning "the discrimination commonly experienced by Roma" living in Romania and parts of Europe.  (Ex. B to Government's Motion.)  The Court should allow Ms. Dumitru to introduce this evidence because it is relevant to at least three issues in the case: whether Ms. Dumitru made false statements; whether Ms. Dumitru did so knowingly and willfully; and whether the false statements at issue were material.

**a.  The Expert Testimony is Relevant to Whether the Statements are False**

The expert testimony concerning the persecution of Roma is relevant to the Government's charge that Ms. Dumitru made false statements – an element of both Count One and Count Two of the Superseding Indictment.  The Superseding Indictment charges Ms. Dumitru with making false statements "[o]n more than 246 of the asylum applications filed by the Dumitru Law Firm."  (Superseding Indictment ¶ 9.)  In response to Ms. Dumitru's prior request for a bill of particulars concerning which statements within the applications are alleged to be false, the Government declined to identify them and instead referred generally to the "boilerplate" personal narrative sections of the applications produced in discovery.

The applications produced in discovery contain multiple statements concerning the general persecution of Roma in Romania.  In fact, *all iterations* of the "boilerplate," which investigators identified as "Common Fact Patterns A through G," include general statements about the persecution of Roma in Romania:

1

Common Fact Pattern A:

"Anti-Gypsy sentiments are widespread in Romania, abuse and police harassment.  I personally have been stopped and questioned by the police often without any reason and accused of things I never did.  The police would never intervene to protect a Gypsy . . . and I'm very scared to go back over there am terrified that my life and my family's life will follow the same course like mine or my parents."

Common Fact Pattern B:

 "Anti Gypsy sentiments and fear of persecution are widespread in Romania and all the European Union, often leading to racist attacks, abuse, and police harassment. . . .  Law enforcement never protects Gypsies.  Very often Gypsies while in police custody are severely beaten and mistreated."

Common Fact Pattern C:

 "Additionally, in Romania, gypsies do not receive any social assistance and they are discriminated against us in the school and church system as well."

Common Fact Pattern D:

"In Romania Gypsies are considered the lowest class of the society and are mostly used for agricultural purposes.  If we want to register our children at school, we are held back by ridiculous requirements that apply only to Gypsy people."

Common Fact Pattern E:

"Anti Gypsy sentiments and fear of formed gangs are widespread in Romania and all the European Union, often leading to racists' attacks, abuse and police harassment.  Even the president of European parliament said that the EU member states must increase their efforts integrate Gypsy and prevent Ghetto life in estate slums and camps where there are no safety standards or protection for the woman and children and a large number of children die in accidents.  There is no protection from law enforcement.  The police would never intervene to protect Gypsy against another Gypsy."

Common Fact Pattern F:

"I am afraid to return to Romania because I am a Gypsy and I will be mistreated and beaten by Romanian society at large because of my ethnic origins, and I don't believe that the government or the police will protect me.  They never protect gypsies, and all my friends or relatives who share the same ethnic origins as I do, consider the same, and were always mistreated by authorities and romanian society."

       Common Fact Pattern G:

"Regarding Gypsies in Romania is now the following situation: The 'new racism' is all about the deliberate manipulation of ignorance. In the atmosphere created by the major political parties unedifying competition to be 'tough' on immigration, fascists can get away with the most outrageous lies. In Romania as well as in the entire Europe the situation is even worse, with outright Nazis leading violent attacks on Gypsy people and the police often given tacit approval. THERE ARE NO LAWS TO DEFEND US."

       In its memorandum of law, the Government quotes the most specific sections of these common fact patterns – statements about "breaking my pencils" and being "attacked by Romanian men" – in an effort to understate the prevalence of these more general statements. However, even these more specific sections contain general statements, such as, "law enforcement does not protect [sic] gypsies in Romania." Given the prevalence of these general statements about the persecution of Roma in Romania in "boilerplate" narratives the Government alleges to be false, Ms. Dumitru should be permitted to introduce expert testimony that these statements are, in fact, true.

       Moreover, with respect to more specific statements, such as those relating to the lack of schooling, bullying, and police abuse, the Court should permit expert testimony on these subjects as well. The Government intends to call six former clients who will testify they did not provide Ms. Dumitru with the story that appears in their respective asylum applications. (Gov't Mem. at 5.) With respect to the other 240 applications, the Government presumably intends to call a summary witness who will testify about the number of instances in which similar boilerplate language appears. From this summary, the Government will likely ask the jury to infer that, given the similar language, such statements must have been false as to the other 240 applications. If the Government is permitted to argue this inference as to these 240 individuals who will not appear at trial, then Ms. Dumitru should be permitted to present expert testimony that these experiences are common in Romania. Such expert testimony will make it more likely that the

statements contained in these applications are true, which renders it relevant.  FRE 401.

### b. The Expert Testimony is Relevant to Whether Ms. Dumitru Acted Knowingly and Willfully

The expert testimony concerning the experience of Roma in Romania is also relevant to any defense Ms. Dumitru puts forth based on her state of mind.  Ms. Dumitru may argue that she did not act knowingly and willfully because she intended to include truthful, general statements about the experience of Roma living in Romania in the "boilerplate" applications.  Evidence that these general statements are true and that Roma do, in fact, experience persecution in Romania, will support the inference that other false, specific statements contained in the applications were a result of accident and carelessness.

### c. The Expert Testimony is Relevant to Materiality

Finally, the expert testimony concerning the persecution of Roma is also relevant to materiality.  In order to be eligible for asylum, a person must establish that he or she has a "well founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  In this case, evidence that Roma are generally persecuted on account of their membership in a social group suggests that Ms. Dumitru had a good-faith basis to seek asylum for those of her clients she believed to be Roma.  While this is relevant to Ms. Dumitru's state of mind, it is also relevant to materiality.  To the extent Ms. Dumitru's clients had legitimate claims to asylum arising from their Roma identity, the presence of other statements about the client's particular experience is less likely to influence the outcome of their application and, thus, less likely to be material.  Expert testimony concerning the common

4

experience of being Roma is, therefore, highly relevant to materiality.[1]

## II. THE COURT SHOULD PERMIT MS. DUMITRU TO INTRODUCE EVIDENCE CONCERNING THE CREDIBILITY FINDINGS ASSOCIATED WITH THE APPLICANTS' ADVANCEMENT THROUGH THE ASYLUM PROCESS

Ms. Dumitru should be permitted to argue that, in certain cases, she did not know statements contained in the immigration applications were false because she believed her clients when they made these statements. Knowledge is an element of Counts One and Two in the Superseding Indictment. The fact that asylum officers and immigration judges – public officials who review immigration applications regularly – found certain of Ms. Dumitru's clients credible and believed their statements to be true is evidence that it was also reasonable for Ms. Dumitru to believe her clients when they made these statements to her. Ms. Dumitru should be able to demonstrate this by eliciting evidence that the clients successfully advanced through certain phases of the asylum process that required findings of credibility and, in some instances, were ultimately granted asylum. This evidence would not be prejudicial or require a side trial, as the Government contends.

Moreover, to the extent the Government's cooperating witnesses or any other witnesses may testify about an interview before an asylum officer or hearing before an immigration judge, any contemporaneous observations by such officer or judge concerning the witness's successful interview or hearing would qualify as a present sense impression and would be admissible under

---

[1] Although the Government's section is directed at Ms. Dumitru's experts on the common experience of Roma, the Government also argues in passing that Professor Lenni Benson's testimony should be limited. Specifically, even though Professor Benson intends to testify about the same or similar subject matter as the Government's expert, the Government seeks to preclude her from testifying about common attorney practices to the extent they may be inconsistent with the law or regulations. However, evidence that certain practices are common among immigration attorneys – even if they are inconsistent with the law – supports the inference that Ms. Dumitru did not know she was doing anything wrong and, therefore, that she did not act willfully.

FRE 803(1).  *See, e.g. United States v. Schlesinger*, 372 F. Supp. 2d 711, 721 (E.D.N.Y. 2005) (admitting evidence of out-of-court statement, "job well done," as a present sense impression, in part, because the statement described what the declarant "observed firsthand through his senses.")

### III.   THE COURT SHOULD PERMIT MS. DUMITRU TO INTRODUCE EVIDENCE CONCERNING HER OTHER OBLIGATIONS AND ACTIVITIES

The Court should also permit Ms. Dumitru to introduce evidence concerning her personal circumstances, obligations and activities.  Evidence that Ms. Dumitru had demands and pressures that limited her ability to focus on her law practice will be directly relevant to the question of whether she knowingly and willfully submitted false statements in immigration documents or whether her conduct was instead due to "carelessness" or "negligence, inadvertence or mistake."  *See* Sand et al., *Modern Federal Jury Instructions*, Instrs. 3A-1, 3A-3.  Indeed, this defense will be consistent with anticipated testimony from the Government's witnesses that Ms. Dumitru was often out of the office and that Ms. Dumitru's employees regularly signed or submitted the immigration documents in place of Ms. Dumitru.

### IV.   THE COURT SHOULD EXCLUDE EVIDENCE OF MS. DUMITRU'S PAYMENT ARRANGEMENT WITH EMPLOYEES

The Court should exclude evidence that Ms. Dumitru paid her employees in a manner to assist their evasion of income tax pursuant to Rule 404(b) because it is not relevant to any issue other than Ms. Dumitru's propensity to engage in wrongful conduct.  The Court should also exclude this evidence under Rule 403 because it is unduly prejudicial.  The Government makes three unavailing arguments as to why this evidence should be admitted.  The Court should reject each of them.

First, the Government contends that the evidence of Ms. Dumitru's "Tax Conduct," as the Government refers to it, is "necessary for the jury's understanding of the relationship between

the defendant her employees . . . ." (Gov't Mem. at 15.) The relationship between Ms. Dumitru and her employees was that of employer-employee. No evidence other than the employees' testimony that they worked for Ms. Dumitru is necessary for the jury to understand it.

Moreover, the Government's argument that the Tax Conduct is necessary to explain why Ms. Dumitru would trust her employees to engage in "such brazen conduct" is belied by the evidence produced to date by the Government. For example, according to notes of an interview with one employee, the employee began engaging in the conduct at issue immediately when she began in June 2015, long before she could have developed a relationship of mutual trust based on the Tax Conduct.[2] Regardless, even if the Tax Conduct preceded the conduct charged in the Superseding Indictment, the Government does not explain why Ms. Dumitru and the employees would immediately trust each other to engage in tax fraud but needed to build up a relationship of mutual trust before they could engage in asylum fraud.

Critically, all three of the cases cited by the Government to support its argument that a prior crime may be admissible to demonstrate a relationship between the defendant and others involved charges of conspiracy. *United States v. Rosa*, 11 F.3d 315, 324 (2d Cir. 1993); *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996); *United States v. Demosthene*, No. 03 CR. 1409 (VM), 2004 WL 1243607, at *1 (S.D.N.Y. June 4, 2004). In those cases, the Government was required to prove that the defendant and the other persons entered into an agreement to commit a crime. In this case, the Government has not alleged a conspiracy and does not need to prove that Ms. Dumitru and her employees entered into an unlawful agreement. The nature of their relationship is therefore irrelevant.

---

[2] These notes are subject to a protective order that precludes the Ms. Dumitru from filing them with this brief in the absence of a sealing order. Ms. Dumitru will make them available *in camera* at the Court's request or file them on consent by the Government.

7

Second, the Government contends "in the alternative" that the Tax Conduct is admissible to rebut a claim that defendant lacked knowledge or intent to commit the charged crimes and to prove that "it was part of the culture of the defendant's law firm to lie to Government authorities." (Gov't Mem. at 18.)  When evidence of uncharged acts is used to establish intent, knowledge, lack of mistake, common scheme or plan, or *modus operandi*, the Government must demonstrate the similarity of the charged and uncharged acts.  *Martoma*, 2014 WL 31213, at *4.  Here, the two transactions at issue – employee tax evasion and immigration fraud – have no similarities whatsoever that would be probative of Ms. Dumitru's state of mind in this case.  *See United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) (excluding evidence of uncharged tax shelters in tax shelter case because "uncharged and charged transactions differ in many respects that undermine any inference of intent or knowledge.") (Kaplan, J.)  Indeed, the Government's suggestion that the evidence would be probative of a "culture" of lying to Government authorities is no different from using the evidence to demonstrate Ms. Dumitru acted in accordance with her "character," which Rule 404(b) precludes.

Third, the Government appears to argue that evidence of the Tax Conduct is relevant to bolster the employees' credibility as witnesses because it demonstrates they told the Government about their own prior misconduct.  In essence, the Government seeks to argue that, because their witnesses told the truth in the past, they must be telling the truth now.  This is plainly improper under Rule 404(b).

Finally, even if the Tax Conduct were relevant for any of the reasons identified by the Government (which it is not), any probative value is substantially outweighed by the danger of unfair prejudice.  Evidence that Ms. Dumitru and her employees engaged in conduct designed to evade taxes carries a high risk that the jury will improperly infer that, because she engaged in

wrongful conduct before, she must have done so in this insistence.  *Stein*, 521 F. Supp. 2d at 275 (S.D.N.Y. 2007) (excluding evidence of tax evasion, in part, due to risk that jury would use evidence for an impermissible purpose).  The Tax Conduct should be excluded for this reason alone.

## CONCLUSION

For the foregoing reasons, Defendant Andreea Dumitru respectfully requests that the Court allow her to introduce (1) expert testimony concerning the common experiences of Roma; (2) evidence that immigration officials deemed certain of her clients credible; and (3) evidence concerning her personal circumstances, obligations and activities.  Ms. Dumitru further respectfully requests an order excluding evidence of Ms. Dumitru's payment arrangement with her employees.

Dated: New York, New York
       October 31, 2018

                                        Respectfully submitted,

                                        SHER TREMONTE LLP


                                        By: /s/ Justin M. Sher
                                            Justin M. Sher
                                            Allegra Noonan
                                        90 Broad Street, 23rd Floor
                                        New York, New York 10004
                                        Tel:  212.202.2600
                                        Fax:  212.202.4156
                                        jsher@shertremonte.com

                                        *Attorneys for Andreea Dumitru*