UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -against- | 18-CR-243 (LAK) |
| ANDREEA DUMITRU, | Oral Argument Requested |
| Defendant. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
ANDREEA DUMITRU'S MOTION FOR ACQUITTAL AND FOR A NEW TRIAL**

Justin M. Sher
Allegra Noonan
**SHER TREMONTE LLP**
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
jsher@shertremonte.com

*Attorneys for Andreea Dumitru*

Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, Defendant Andreea Dumitru respectfully submits this Reply Memorandum of Law in further support of her motion for acquittal and for a new trial.

## ARGUMENT

### I. Ms. Dumitru Should Have Been Permitted to Present Testimony Regarding the Common Experience of Roma Individuals

The Court should grant a new trial to permit Ms. Dumitru to introduce testimony regarding the common experience of Roma living in Romania and parts of Europe. In opposition to the defense motion, the Government responds that it "purposefully steered clear" of references to general statements regarding the persecution of Roma and then quotes several portions of its opening remarks that purportedly "unambiguously" refer to only specific narratives. However, broadly categorizing the applications that Ms. Dumitru filed as "specific" and "personal" does not convey to the jury that the Government's position was that only *some parts* of these applications were specific or personal and therefore false. Government's Memorandum of Law in Opposition ("Government Opp."), Dkt. 91 at 6. Instead, it emphasizes to the jury that they should draw the problematic inference described by the Defendant in her opening memorandum of law – that if language is repeated across multiple asylum applications, it must be false.

Next, the Government argues that a one-sentence statement wherein the jury was told "this case is not about whether some members of that ethnic group have been treated poorly in other parts of the world" was sufficient to clarify that the Government was not taking issue with the applications as a whole but only the "specific" parts of each application. Government Opp., Dkt. 91 at 6. This single sentence does not provide any needed clarity, as it could easily have further confused the jury as to whether statements in the asylum applications at issue concerning the general mistreatment of Roma in Romania and parts of Europe were false in light of the

2

Government's assertion that only "some" members of the social group have been treated poorly "in other parts of the world."  Government Opp., Dkt. 91 at 6.

As for the questioning of Ms. Isaacson, the Government's insistence that it intended to cabin its question about repetitive sentences to the specific paragraph in GX 653 is of no consequence because the question posed to Ms. Isaacson did not concern a "specific" or "personal" story.  Nor did the questioning of Ms. Isaacson about repetitive language refer to specific facts relating to a person applying for a job at a factory.  Government Opp., Dkt. 91 at 7.  Regardless of the intent behind the question, it was phrased broadly enough that the jury could reasonably understand it to include any sentence that was repeated within multiple applications.

With respect to the exhibits used during the questioning of Agent Posilkin, the Government now argues that the entirety of the statement highlighted for the jury *was* a specific statement, including the general statements about interactions between Roma persons and law enforcement in Romania.  Government Opp., Dkt. 91 at 8.  Had the defense been permitted to offer testimony from witnesses regarding the common experience of Roma individuals, it would have been clear to both the Government and the jury that negative interactions between Roma and law enforcement are a common experience of Roma in Romania and therefore the statement that "law enforcement does not protect Gypsies in Romania" is in fact an accurate general statement.

As the Government highlights in its own briefing, "generalized statements of mistreatment" were interspersed with the specific personal narratives in this case.  That remains true regardless of how much these statements are emphasized to the jury.  In fact, contrary to the assertion that the defense "omits" this "important fact," Dkt. 91 at 8, the defense itself raised the issue of these general statements being interwoven with specific stories during oral argument at

3

trial. Tr. at 350: 21-25 (". . . Throughout the applications that are being submitted as evidence, those statements appear, so I think it's difficult to separate those statements from the specific factual statements").[1] This was the case on every I-589 included in the Government's exhibits—over one hundred of which were given to the jury during their deliberations and several of which were shown to the jury.

Testimony from witnesses concerning the common experience of Roma was necessary to demonstrate that general statements concerning the persecution of Roma that appeared in multiple asylum applications were, in fact, true. This evidence would also support Ms. Dumitru's defense that she instructed others in her office to include in the asylum applications only general statements concerning the common experience of Roma and that, because of the severe and pervasive persecution of Roma, certain inaccuracies contained in the applications may have been immaterial. Because simply being Roma in Romania could be sufficient to demonstrate well-founded fear to the relevant decision-maker, the exclusion of testimony regarding the general treatment of Roma individuals virtually eliminated Ms. Dumitru's defense that the false statements were not material and effectively precluded her from arguing the issue of materiality. The Court's instruction attempting to clarify that generalized statements were not at issue was not sufficient because the Court did not (and could not) distinguish for the jury precisely which statements were at issue. As suggested by the Government's own brief, where the Government argues the sentence, "law enforcement does not protect Gypsies in Romania" is a specific, personal statement, the jury may have had trouble distinguishing precisely which statements were general and which were specific.

---

[1] Tr. refers to the Trial Transcript.

## II. The Court Improperly Admitted Prejudicial Testimony of Uncharged Conduct and Prior "Bad Acts"

The testimony from Alexandra Miron regarding the payment arrangements she made with Ms. Dumitru to avoid tax liability, the payment arrangements other employees of the office made with Ms. Dumitru, and the tax audit performed at Ms. Dumitru's law offices, was highly prejudicial evidence of uncharged conduct and unrelated bad acts and therefore should have been excluded. As it argued before, the Government explains that this evidence was necessary to show a level of "mutual trust" between Ms. Dumitru and her employees to bolster its argument that her employees were willing to file false documents at Ms. Dumitru's direction. Government Opp., Dkt. 91 at 10. However, the testimony elicited from Alexandra Miron was far from limited to establishing a relationship of trust between the witness and Ms. Dumitru, and instead was designed to give the jury the impression that Ms. Dumitru was evading taxes and being dishonest with government entities to make extra money. Indeed, the Government's request that Ms. Miron identify Ms. Dumitru's BMW in a photo only served to reinforce this impression. Tr. at 312:19-24.

Significantly, Ms. Miron's own testimony about why she trusted Ms. Dumitru was entirely unrelated to the tax conduct. In response to the Government's questions, Ms. Miron stated that she "didn't really think much" of signing clients' names because she "trusted her instructions and *her posture as an attorney and my boss*." Tr. at 341:2-6 (emphasis added). The word "trust" does not appear again throughout the entirety of Ms. Miron's testimony. In a similar exchange, Ms. Miron testified that she thought copying and pasting was "okay" because she had "no prior immigration law experience" and that "Ms. Dumitru, who was [her] boss, told [her] to do that…" Tr. at 332:17-20.

5

In fact, contrary to the Government's position that Ms. Dumitru's employees knew they were doing something wrong and continued due to "mutual trust," Ms. Miron testified that she "didn't suspect that there was anything wrong" with signing client's names for "some period of time." Tr. at 371:15-18. Ms. Miron testified that even after she became "a bit concerned about the way things were running" she still "didn't think of it as criminal . . . " Tr. at 373:24-374:6. The tax conduct testimony was therefore highly prejudicial, and yet entirely unnecessary in order to explain the relationship between a supervisor and her superior.

The Government notes that ultimately it did not mention the tax conduct in its jury addresses, and that the evidence only arose during the testimony "of a single witness" because its other evidence was "so strong." Government Opp., Dkt. 91 at 10. To the extent this argument suggests that the evidence of the tax conduct was not necessary or relevant to the ultimate issues at trial, there is no question that its prejudicial nature outweighed any probative value. If this argument instead suggests that Ms. Miron's testimony was somehow inconsequential at trial, the Government understates the obvious and significant impact of Ms. Miron's testimony. Ms. Miron was the only former employee to testify at trial. She was the only witness who testified to the inner workings, practices, and patterns of Ms. Dumitru's offices. Therefore, while she may have been the only witness to testify to the prejudicial tax conduct introduced into evidence, her testimony clearly had the ability to affect the jury's verdict. Regardless of whether this evidence was included in the Government's jury addresses, the uncharged conduct and prior bad acts evidence was not probative of any issue in the case and instead only served to prejudice Ms. Dumitru at trial.

## CONCLUSION

For the foregoing reasons and the additional reasons set forth in Ms. Dumitru's opening brief, Defendant Andreea Dumitru respectfully requests an order acquitting her of Count Two and granting her a new trial on Counts One and Three.

Dated: New York, New York
December 24, 2018

Respectfully submitted,

SHER TREMONTE LLP

By: /s/ Justin M. Sher
Justin M. Sher
Allegra Noonan
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
jsher@shertremonte.com

Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Tel: 212.237.1018
Fax: 212.262.1215
jhoffman@windelsmarx.com

*Attorneys for Andreea Dumitru*