UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -against-

ANDREEA DUMITRU,

                Defendant.

18-CR-243 (LAK)

**SENTENCING MEMORANDUM ON
BEHALF OF DEFENDANT ANDREEA DUMITRU**

Jeffrey C. Hoffman
WINDELS MARX LANE
& MITTENDORF LLP
156 West 56th Street
New York, New York 10019
Tel: 212.237.1018
Fax: 212.262.1215

*Attorneys for Andreea Dumitru*

On the Brief:
Diane Fischer, Esq.
Susan C. Wolfe, Esq., *Of Counsel*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

I.   MS. DUMITRU'S BACKGROUND ............................................................... 2

II.  THE OFFENSE CONDUCT ........................................................................... 7

III. THE GUIDELINES CALCULATION .......................................................... 8

    A.  The Probation Department's Advisory Guidelines Calculation .......................... 8

    B.  There Is Insufficient Evidence to Support Certain Enhancements
        to the Base Offense Level ................................................................... 9

        1.  The Evidence at Trial Did Not Sufficiently Establish That
            More Than 100 Fraudulent Documents Were Submitted ............................. 9

        2.  Ms. Dumitru Was Not an Organizer or Leader of Criminal
            Activity That Involved Five or More Participants or
            Was Otherwise Extensive ............................................................ 14

    C.  The Correct Guidelines Calculation .................................................. 17

IV.  THE TWO-YEAR MANDATORY MINIMUM IS A MORE THAN
    SUFFICIENT SENTENCE ............................................................................ 17

    A.  The § 3553(a) Factors .................................................................... 17

        1.  The Circumstances Under Which the Offense Occurred ........................... 17

        2.  Ms. Dumitru's History and Characteristics ........................................ 18

        3.  The Need for the Sentence Imposed (a) to Reflect the
            Seriousness of the Offense, to Promote Respect for the Law,
            and to Provide Just Punishment for the Offense; (b) to Afford
            Adequate Deterrence to Criminal Conduct; and (c) to Protect
            the Public from Further Crimes of the Defendant ................................. 23

        4.  The Need to Provide the Defendant with Needed Educational
            or Vocational Training, Medical Care, or Other Correctional
            Treatment in the Most Effective Manner ........................................... 25

5. The Kinds of Sentences Available; the Kinds of Sentence
and the Sentencing Range Established for the Applicable
Category of Offense ............................................................................... 25

6. The Need to Avoid Unwarranted Sentence Disparities, to
Provide Restitution to Any Victims, and Any Pertinent
Policy Statements ................................................................................... 25

7. The Appropriate Sentence .......................................................................... 27

B. The Court Should Grant A Downward Variance in
Light of Ms. Dumitru's Family Circumstances ................................................ 28

CONCLUSION ..................................................................................................... 31

## PRELIMINARY STATEMENT

Andreea Dumitru respectfully submits this Memorandum in anticipation of sentencing, currently scheduled for May 1, 2019.  On November 19, 2018, following a seven-day trial before Your Honor, a jury convicted Ms. Dumitru of one count of asylum fraud in violation of 18 U.S.C. § 1546(a), one count of false statements in violation of 18 U.S.C. § 1001(a)(2) and (3), and one count of aggravated identity theft in violation of 18 U.S.C. § 1028(a)(1).  She was remanded and has been in custody at the Metropolitan Correctional Center since the date of her conviction.

Ms. Dumitru's 43 years of life have straddled, in almost equal measure, two worlds that could not be more disparate, in every respect.  From childhood until early adulthood, she lived in a society dominated by collectivism.  No value was placed on individual effort or personal achievement, and none of those things inured to one's socioeconomic status or benefit.  The fruits of one's labor, which was usually exhaustive, ended up in a vast ether and came back as a voucher for meat or clothing.  On the eve of turning 23, Ms. Dumitru arrived in Queens, New York, where she quickly saw that the effort she put in at her job and towards her education could make a meaningful difference in the quality of her life.  As she had been conditioned to do, she labored until she was able to support herself, and then to get a law license and open her own law practice. She assimilated to American culture, where greater effort led, hopefully, to greater gains. Despite her efforts, she struggled to support her family and fulfill her desire to elevate their circumstances.  She allowed herself to enter those gray areas where good judgment defers to rational measures, and is here as a result.

Upon consideration of Ms. Dumitru's background and family circumstances, and consistent with the factors set forth in 18 U.S.C. § 3553(a), we ask the Court to sentence Ms.

Dumitru to no more than the two-year mandatory minimum required by her conviction for aggravated identity theft. We have attached letters of support submitted by family members, friends and colleagues, excerpts from which are quoted in this Memorandum, for the Court's consideration in connection with the statutory sentencing factors.[1]

We first address the Sentencing Guidelines, including our objections to the Guidelines calculation in the Presentence Investigation Report ("PSR")[2], and the reasons why her total offense level should be 15 with a Guidelines range, as an offender in criminal history category I, of 18 to 24 months.

Taken together, we submit that a sentence to the mandatory minimum comports with the goals and purposes of sentencing, and the letter and spirit of the parsimony principle.

## I.      MS. DUMITRU'S BACKGROUND

Andreea Dumitru was born in early September, 1975 in Bucharest, Romania, the only child born to the marital union of Petre Parcalaboiu and Gabriela Popescu. Andreea's father was employed as an engineer and her mother was a school teacher. PSR ¶ 44. They both worked long hours at respectable professions, which would have earned them a comfortable middle-class life had they not lived under the harsh dictatorship of Nicolae Ceaușescu. Ceaușescu was a totalitarian whose communist regime was considered one of the most repressive and oppressive in Eastern Europe at that time.[3] In an effort to reduce Romania's

---

[1]  The letters of support are attached as exhibits to this Memorandum. Letters that are not specifically excerpted are collectively attached as Exhibit P.

[2]  Citations to PSR correspond to the Revised Presentence Report dated February 15, 2019.

[3]  *See* Encyclopaedia Britannica, "Nicholae Ceaușescu," *available at* www.britannica.com/biography/Nicolae-Ceausescu (last updated January 22, 2019).

national debt, Ceaușescu exported the majority of the country's agricultural and industrial products, forcing the population into austerity and drastically lowering living standards. *Id.*

Andreea would not describe her childhood as a "happy" one. PSR ¶ 44. She was raised in a small, unadorned one-bedroom apartment with her parents and grandparents. *Id.* Andreea and her grandparents used the living room as their sleeping quarters at night, and she shared a bed with her grandmother until the age of 13. *Id.* The country's extreme fuel and energy shortages frequently resulted in the loss of cooking gas for the stove and heat in the winter, and hot water was limited to a one day per week. Each day at 4:00 a.m., Andreea's grandfather joined a queue in front of the local store in readiness for the morning milk delivery, which would sell out almost immediately after it opened its doors. Other basic food items such as butter, oil, sugar and meat, were rationed out through a voucher system and could be obtained only on an assigned day each week. *Id.* The young girls all had the same Russian-made dolls to play with and wore the same clothes (also acquired through the voucher system). The Parcalaboiu's car, like most others in the neighborhood, remained permanently parked and empty of gas. *Id.* Education was one of the few government services that was adequately funded and strongly promoted, and, from a young age, Andreea studied a wide range of subjects, including literature, history, music and Latin.

Because her parents worked long hours, she only ever saw her father on Sundays and was left primarily under the care of her grandparents. PSR ¶ 45. Andreea's grandmother was her mother figure and they were exceptionally close. *Id.* Although religion was disavowed by the communist state, Andreea and her grandmother often prayed together at home and she developed a strong faith. Andreea's parents divorced when she was 13, after which Petre left the home and Andreea had even less contact with him. PSR ¶¶ 45-46.

Ceaușescu was overthrown after a revolution in 1989, and living standards slowly began to improve.  Between 1989 and 1993, Andreea attended the Nicolae Tonitza Fine Arts High School, a reputable visual and fine arts school.  She planned to pursue a career in fashion but her parents, concerned that it would not provide a dependable income, persuaded her to attend law school instead.  In her fourth and final year at Bucharest School of Law, Andreea obtained a job as a legal assistant and started working in the Romanian courts.  As a graduation gift, her mother's cousin, who lived in Sunnyside, Queens, arranged for Andreea to visit New York.  PSR ¶ 48.  In July, 1998, Andreea obtained a tourist visa and traveled to New York the following month.  *Id.*

Sunnyside had at that time a sizeable Romanian population, reflected in the local shops and businesses.  On the morning following her arrival, Andreea's aunt asked her to pick up some items from a nearby Romanian grocery.  Knowing her aunt was a regular customer, Andreea introduced herself to the store manager, Cristian Dumitru. It was an encounter she would later characterize as "love at first sight," and in August, 2000, they were married.[4] PSR ¶ 49.

By the time she married, Andreea was working as a writer and assistant editor for a Romanian-American newspaper and had enrolled in New York Paralegal School.  PSR ¶ 58. In July, 2003, Andreea and Cristian's daughter ██████ was born.  The birth prompted Cristian's parents to emigrate from Romania and move in with them.  For the next three years, the four adults and growing child shared a junior one-bedroom apartment.  Andreea

---

[4] Andreea obtained a "green card" and became a legal permanent resident in 2004.  PSR ¶ 48.  She became a naturalized citizen on July 13, 2007.  *Id.*

felt that her daughter's childhood was too closely mirroring her own, and she wanted more for her.

Andreea's income from the newspaper became insufficient to support the increased household expenses and, in December, 2003, she decided to leave it and start her own business. She had noticed over the years that there was a need in the community for language translation and interpretation services, particularly among Romanian residents who wanted to send vital records from the U.S., such as a birth and marriage certificates, back to their home country through the Roman Consulate. In January, 2004, she opened her first business, ALDP & Associates, Inc. ("ALDP"), to provide translation, interpretation, and notarization services. PSR ¶ 63. She taught herself bookkeeping as a way to expand her services and was referred to an accountant, Bob Kutler, who looking to outsource some client work. One of Kutler's main clients was a Russian-born attorney named Evgeny "Gene" Freidman, who owned hundreds of New York City yellow cab medallions under an entity called Taxi Club Management, Inc. ("TCM"). Freidman, who was later dubbed New York City's "Taxi King," was rapidly expanding his taxi fleet within New York City and to several other major cities across the country. By 2012, TCM was valued at more than a hundred million dollars.[5] After two years working for Kutler servicing the TCM account and Freidman's personal books, Andreea was offered and accepted a part-time position overseeing TCM's accounting department. PSR ¶ 62.

By 2006, Andreea was devoting three days per week to TCM, working to build her own business (ALDP), and attending a part-time L.L.M. program at Benjamin N. Cardozo

---

[5] *See* Raul Hernandez and David Choi, "The rise and fall of New York City's 'Taxi King' who reportedly agreed to cooperate with the government as a potential witness against longtime business partner Michael Cohen," *available at* https://www.businessinsider.com/nyc-taxi-king-rise-fall-2017-8 (last updated May 23, 2018).

School of Law.  All the while, she was caring for a three-year-old at home.  Andreea earned her L.L.M. in June, 2006 (PSR ¶ 59), but was spread too thin to adequately prepare for the bar exam.  Over the next four years, she took the bar exam eight times, until she passed.

In September 2010, Andreea opened her law practice office, Andreea Dumitru & Associates, P.C., at 17 Battery Place in Manhattan.  PSR ¶¶ 60-61.  She soon ran into difficulty finding clients and paying for a Manhattan office, and moved her office back to the Romanian community in Sunnyside.  She opened as a general law practice, handling everything from divorces and real estate transactions to wills and trusts, but the area's highest demand was for immigration services.  The law practice did not generate much income, so Andreea maintained the translation business and her part-time work for TCM.

By 2012, the strain of juggling three jobs, carrying the family's financial burden and caring for her daughter began to affect her marriage.  Cristian, who handled many of the domestic duties, began to suffer from depression.  Andreea's in-laws stepped in to help care for their granddaughter, but Andreea had to absorb Cristian's responsibilities into a schedule she was already unable to manage.  She was forced to hire part-time administrative staff and a full-time legal assistant at the law practice in order to keep the translation business and her job with TCM.  Then, in the spring of 2013, Andreea was diagnosed with early stage breast cancer.  In the months that followed, amid medical tests and doctor's visits, she was unable to keep pace and her work began to suffer.  She underwent a lumpectomy at Memorial Sloan Kettering the following September, and the cancer has been in remission since then. PSR ¶ 53.

At home, her marriage was in a shambles and beyond repair.  Andreea and Cristian separated before the end of the year and their divorce was finalized in the summer of 2014.

PSR ¶ 49.   Pursuant to the divorce settlement, Andreea retained the law practice and transferred ownership of the translation business, which had been renamed ACAD, Inc., to Cristian.

That same year, Andreea left TCM to concentrate on her law practice, but felt physically and emotionally debilitated by her divorce and cancer treatment.   Although it was not required by their agreement, Andreea permitted Cristian to continue operating ACAD from within her law office and did not charge him rent.   She was regularly falling behind on the business expenses and, by the summer of 2015, decided to again accept a job with Freidman and TCM.   She used a separate office space within the law practice from which she operated TCM's "outside" accounting department several days per week.   Looking back, Andreea recalls that she was "running after too many things at the same time without properly accomplishing any."

In 2014, Andreea was introduced to Sorin Ghisoiu through a mutual friend.   PSR ¶ 50.   They are currently engaged and lived in Andreea's apartment in Sunnyside at the time of the instant offense.   PSR ¶ 51.   Sorin developed a close relationship with Andreea's daughter, and they are a tight-knit family.   Sorin, Andreea and █████ were especially fond of taking weekend ski trips upstate to Wyndham Mountain during the winter and developed friendships with area residents, some of whom have submitted letters on Andreea's behalf.   Sorin remains supportive of Andreea and has been helping to care for █████ in her absence.   PSR ¶ 50.

## II.   THE OFFENSE CONDUCT

Ms. Dumitru was charged in Indictment 18 Cr. 243, filed on March 27, 2018, with one count of asylum fraud in violation of 18 U.S.C. § 1546(a) and one count of making false statements to the United States Department of Homeland Security and the Executive Office

for Immigration Review in violation of 18 U.S.C. § 1001(a)(2) and (3), during the period of 2012 through 2017.  On September 13, 2018, the government filed a Superseding Indictment, which added a single count of aggravated identity theft in violation of 18 U.S.C. § 1028(a)(1) carrying a mandatory minimum sentence of two years imprisonment to run consecutively to any other term of imprisonment imposed by the Court.  PSR ¶ 1.  The Indictment alleged, *inter alia,* that Ms. Dumitru filed asylum applications containing false statements about such things as the applicant's criminal history and their individual narratives of alleged persecution.  PSR ¶¶ 15-16.

After a seven-day trial, a jury found Ms. Dumitru guilty on all three counts.  PSR ¶ 6. She was remanded pending sentencing by this Court.

## III.   THE GUIDELINES CALCULATION

### A.   The Probation Department's Advisory Guidelines Calculation

The Probation Department calculated the Guidelines Range as follows:

Base Offense Level for Asylum Fraud and False Statements, after grouping counts, pursuant to §2L2.1(a) .......................................................11

Enhancement because offense involved at least 100 fraudulent documents, pursuant to §2L2.1(b)(2)(C) .................................... +9

Enhancement for abuse of a position of public or private trust or use of a special skill, pursuant to §3B1.3 ............................ +2

Enhancement for role as organizer or leader of a criminal Activity that involved five or more participants §3B1.1(a).......................... +4

Total Offense Level.................................................................................26

Ms. Dumitru has a total criminal history score of zero and is in criminal history category I.  PSR ¶ 38.  According to the Probation Department's calculation,  her Guidelines Range is 63 to 78 months' imprisonment.  Ms. Dumitru must serve a two-year term of

imprisonment for her conviction of aggravated identity theft consecutive to any term of imprisonment imposed by the court.  For her convictions of asylum fraud and false statements the Probation Department recommends that the Court sentence Ms. Dumitru to a non-guidelines sentence of 24 months each, to run concurrently.

### B. There Is Insufficient Evidence to Support the Enhancements To the Base Offense Level

The government bears the burden of proving any factual allegations in support of a sentencing enhancement by a "preponderance of evidence."  *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003) (internal citation omitted).  *See also, United States v. Zagari*, 111 F.3d 307, 323 (2d Cir. 1997)(preponderance of the evidence standard applies to consideration of relevant conduct in sentencing).  In determining whether to consider disputed allegations, "a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) (citation omitted).  The evidence must bear "sufficient indicia of reliability to support its probable accuracy." *United States v. Cruz*, 586 Fed. Appx. 36, 38 (2d Cir. 2014) (summary order) (quoting U.S.S.G. § 6A1.3 & cmt.).  For the reasons set forth below, certain enhancements resulting in a 13-level increase to the Base Offense Level do not apply to the facts of Ms. Dumitru's case.

### 1. The Evidence at Trial Did Not Sufficiently Establish That More Than 100 Fraudulent Documents Were Submitted

The government contends that the evidence submitted through four former clients, Ms. Dumitru's former employee, Alexandra Miron, and a summary witness who testified regarding the similarities among the applications, proves by preponderant evidence that the nine-level enhancement for 100 or more fraudulent documents is warranted.  *See* PSR at p. 17.  Miron's testimony, as discussed below, did not provide evidence regarding a specific

quantity of false applications; therefore, applicability of the enhancement depends solely on the testimony of the government's summary witness.

The Second Circuit addressed the issue of "quantity-based" evidence to support a §2L2.1(b)(2) enhancement in both *United States v. Archer,* 671 F.3d 149 (2d Cir. 2011) and *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999). Before applying a quantity-based enhancement, the district court must find (1) that there was "evidence regarding the quantity of illicit or fraudulent goods [or services]" and (2) the evidence was "specific to the defendant." *Archer*, 671 F.3d at 162 *citing United States v. Shonubi* ("*Shonubi I*"), 998 F. 2d 84, 89 (2d Cir. 1993)(discussing the first prong) *and United States v. Shonubi* ("*Shonubi II*"), 103 F. 3d 1085, 1090 (2d Cir. 1997)(discussing the second prong).

In *United States v. Archer,* an immigration attorney was convicted after trial of conspiracy to commit visa fraud and substantive visa fraud for filing false I-687 applications to The Department of Homeland Security ("DHS"). During the two years that the I-687 program ran, Archer filed between 230 and 240 applications. *Id.* at 154-155. The evidence at trial included the testimony of four former clients and a DHS officer, who presented a statistical summary of the similarities between 175 applications with respect to the applicant's qualifications. *Id.* The analysis concluded that: (i) in all of them, the applicant had entered the country illegally rather than overstayed; (ii) 96% claimed the same year of entry into the U.S.; and (iii) 90% claimed the same travel period (a prerequisite). *Id.* at 156. Based on the DHS officer's testimony, the district court applied the nine-level enhancement pursuant to §2L2.1(b)(2)(C). *Id.* at 157.

The Second Circuit vacated the sentence, holding that application of the enhancement was erroneous because the government 1.) "presented no evidence that the four applications

proven false at trial were…a representative slice of the 175 applications," and 2.) "without a baseline as to what the national pool of I-687 applications…looked like to compare it to… the data tells us nothing about the truth or falsity of the applications." *Id.* at 163-164.  The *Archer* court further held that "[w]hen the Guidelines allow for punishment of relevant conduct as though it were convicted conduct, we have a *special obligation* to ensure that the evidence of relevant conduct is solid." *Archer,* 671 F.3d at 165 *citing United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir.1997) (emphasis added).

The *Archer* court distinguished its earlier decision in *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999).  In *Walker*, the former Immigration and Naturalization Service ("INS"), suspected fraud after it compared applications submitted by Walker, also an immigration attorney, and discovered that "many were substantially identical."  191 F.3d at 330.  At trial, the government introduced the testimony of several of Walker's clients, two former employees and an INS research specialist who examined 1,365 applications submitted by Walker's office.  *Id.* at 331.  The specialist testified that he found "patterns" in the applications that were based on where the applicant was from, including stories that were repeated almost verbatim.  *Id.*  In contrast to the evidence in Ms. Dumitru's case, Walker's filing clerk specifically testified that he "helped to fill in the details on a backlog of over a thousand asylum applications, selecting accounts of persecution from a collection of stories that the office kept in a drawer."  *Id.* at 332.  The Second Circuit held that the filing clerk's testimony regarding the number of applications he personally processed *together with* the INS specialist's testimony satisfied the evidentiary standard for application of the quantity-based enhancement.

The *Archer* court referenced its decision in *Walker* to underscore the sentencing court's "special obligation" when evaluating evidence of relevant conduct, observing that even though presented with the "incriminating character of similarities" such as "word-for-word detail" among over 1,300 applications, the court "ultimately rested its conclusion that more than 100 false documents were involved on *direct testimony regarding the number of documents*" processed by the defendant's filing clerk. *Archer* at 164 & n.7 (emphasis supplied) *citing Walker*, 191 F.3d at 339.

The government's evidence here falls short of what is required by *Archer* and *Walker*. Miron testified that she used several methods to fill out the I-589s.  Either she used information orally provided by Ms. Dumitru after a client meeting, notes in the client's file, or "sometimes" she just copied information from a prior application. Tr. 330: 12-19.[6]  She testified that she used the last method on "probably over a hundred applications" but twice admitted that "she didn't keep count." Tr. 332: 10-12.  *See also* Tr. 361: 3-7.  Miron's equivocal testimony cannot support the conclusion that she completed more than 100 documents with false information.

Mason Posilkin, a Special Agent with the Public Corruption and Complex Fraud Unit of the U.S. Attorney's Office, testified that he reviewed the narrative section of 105 I-589 applications to look for "similar stories." Tr. 593: 9-12.  He identified five "near identical" or "common" stories in the applications  (Tr. 594: 16-21) and two in the affidavits (Tr. 606: 20-22) (collectively, "the narratives").  From  this, he created summary charts depicting the frequency with which each of the narratives appeared within the 105 applications.  Tr. 595: 22-24.

---

[6] References to the Trial Transcript are indicated by "Tr." followed by the page and line numbers.

Posilkin's analysis cannot support the conclusion that over 100 applications contained false statements. As an initial matter, the number of applications on which Posilkin based his analysis is barely over the threshold for the nine-level enhancement, requiring a conclusion that 96% of the applications contained a false narrative even though a great number of applicants shared the same cultural and ethnic background. In addition, a total of eight applications from the collection that Posilkin reviewed do not appear on either of the two summary charts, indicating that only 97 applications contained one of the narratives.

Posilkin further described the narratives as "near identical" but then testified regarding multiple differences among them. For example, with respect to the broken school supplies narrative, he testified that "the wording is not word for word but you can see references to breaking pencils, books, and you can see reference to clothing as well" and "sometimes a number of years would be changed." Tr. 597: 22-25 – 598: 1-2. It is absurd to suggest that broken pencils, books and clothing cannot be a common, truthful narrative; it would be just as true for many public school students in New York City as it would be for children, especially between different ethnic groups, living under the Ceaușescu regime. It is also reasonable to assume that a parent's description of their child's victimization by school bullying would be reduced to writing in similar language, especially because their narratives were being translated from their first language to English by someone whose first language also was not English.[7] With respect to a narrative in some of the affidavits regarding

---

[7] Another narrative, which Posilkin characterized as "bitten by police" in his summary chart is a similar red herring. The full description of the narrative reveals a "rough" translation from Romanian to English: "My parents was persecuted by police and Romanian civilians and many times happens that police came to our door asking my parents about things that they never done or know about…Once my father came home very scared because he was taken by the police on the reason that testifies *wondering the streets to still bitten and threatened badly*." Tr. 599: 3-12. While multiple stories of being "bitten" by the police might suggest delusion, unless Romanian Police actual enforced the law by biting people, or were vampires (maybe it was in Transylvania?), falsity

elementary school, he testified that "Again, sometimes the years would change…it might be attending elementary school for a different number of years, and sometimes they didn't have all of the same paragraphs."  Tr. 610: 19-22.  Posilkin's testimony also contradicts that of Miron, who specifically testified that she "copied and pasted" some applications, which would result in *identical* narratives.  Tr. 331-332.  Lastly, Posilkin testified that the numbers on the summary chart, when totaled, would not equal 105 "[b]ecause some of the applications had multiple similar stories."  Tr. 614: 11-16.  Posilkin did not testify, however, that 100 or more applications contained at least *one* narrative, which explains the absence of eight of the 105 exhibits on the summary charts.

Based on the above, only the applications of the four clients, each of whom provided specific testimony about the false information in their application, meet the evidentiary standard required by *Walker* and *Archer*.  A quantity-based enhancement pursuant to § 2L2.1(b)(2) is not warranted.

### 2.   Ms. Dumitru Was Not an Organizer or Leader of Criminal Activity That Involved Five or More Participants or Was "Otherwise Extensive"

Section 3B1.1(a) defines a participant as a "person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1, cmt. n.1.  In order to be "criminally responsible," a participant must have "knowledge of and participated in the criminal activity."  *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995) *citing United States v. Lanese,* 890 F.2d 1284, 1293 (2d Cir. 1989).  For the adjustment to apply in the absence of five or more "criminally responsible" participants, the activity must

---

cannot be gleamed from something so obviously a mistake.  Stories of individuals being "*beaten*" and threatened by the police are much less likely to appear idiosyncratic.

be "otherwise extensive," which involves determining "(i) *the number of knowing participants*; (ii) *the number of unknowing participants* whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) *the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme*." *United States v. Skys*, 637 F.3d 146, 157 (2d Cir. 2011)(emphasis in original) *citing United States v. Rubenstein,* 403 F.3d 93, 99 (2d Cir.) *cert. denied,* 546 U.S. 876 (2005). In effect, for the criminal activity to be "otherwise extensive" it must, "at the very least…[be] the functional equivalent of an activity involving five or more participants." *Id.* (citation omitted)

The only evidence at trial pertaining to the activities of Ms. Dumitru's employees was testimony from Miron. Miron, who admitted to completing applications with false information, identified six individuals who were employed by Ms. Dumitru at various times: Daglish Gobinda, Bianca Koncz[8], Lilian Mattei, Alexandra Chitiu, Adrian Caramihai and Galina Barbascumpa. Tr. 315: 4-20. Miron offered the following testimony regarding each employee's specific job duties:

Q. What was their role in the office?

***

A. So Daglish Gobinda was working on some administrative tasks just as me. I don't believe she [*sic*] was doing translations because he doesn't know Romania [*sic*], and I believe he was also performing other duties related to the law firm, but to another work of Ms. Dumitru. Then Bianca [Koncz] she was performing the same duties as I was for the time that I was there. I subsequently left on maternity leave so I'm not completely knowledgeable of everything that she did. Upon my return later I believe Lilian Mattei started and she was performing -- I don't believe she was answering the phone, but she was filling out forms and she was assisting with other administrative duties.

Subsequent to Lilian, Alexandra Chitiu started, and she also did reception work and down the line paperwork and working on clients'

---

[8] The court reporter misheard Ms. Koncz's last name; it is reflected in the transcript as "Cohen."

case files.  Adrian Caramihai did the same nature of work, filling out forms, sometimes picking up the phone and Galina Barbascumpa, she was assisting with legal work as well.

Tr. 315: 4-20.

In *United States v. Beckford,* 2006 WL 1390414, at \*1 (S.D.N.Y. May 17, 2006), the court declined to apply a § 3B1.1 enhancement to a bank branch manager, Beckford, who directed a bank employee to falsify records in order to conceal theft by other bank employees, he among them.  The court held that there was no evidence that the employee that Beckford directed was criminally responsible for the offense because there was no evidence that the employee knowingly made the false entry.  *Id.* at \*11. *Compare United States v. Kilkenny*, 493 F.3d 122, 131 (2d Cir. 2007)(uncontested evidence that bookkeeper who misrepresented herself in letter to bank and falsely stated amount of defendant's monthly commissions at his direction was criminally responsible participant); *Brinkworth*, 68 F.3d at 642 (defendant's accountant was a criminally responsible participant because he did not report income on defendant's tax returns despite having "specific knowledge" that such income must be reported).

Miron's testimony shows that she lacked both general knowledge of the other employees' duties and any specific knowledge of whether they completed asylum applications with false information.  Miron's testimony cannot support the conclusion that any of the other employees is criminally responsible for filing false asylum applications.  The facts also do not support a finding that the activity was "otherwise extensive," since there was no evidence that individuals outside of Ms. Dumitru's law office performed services that were "peculiar and necessary" to the commission of the offense.  Ms. Dumitru is therefore only subject to a two-level enhancement pursuant to § 3B1.1(c).

## C. The Correct Guidelines Calculation

Based on the above, Ms. Dumitru's Base Offense Level is 11, there is a two-level enhancement pursuant to § 3B1.3 and a two-level enhancement pursuant to § 3B1.1(c). Ms. Dumitru's total adjusted offense level is 15 with a Guideline Range of 18 to 24 months.

## IV.   THE TWO-YEAR MANDATORY MINIMUM IS A MORE THAN SUFFICIENT SENTENCE

Ms. Dumitru must serve two-years' imprisonment for her conviction of aggravated identity theft regardless of what sentence is appropriate after considering the § 3553(a) factors. *See U.S. v. Carter*, 696 F.3d 229, 232 (2d Cir. 2012)(sentencing provisions in § 3553(a) give way to mandatory sentencing provisions). For the reasons discussed below, we submit that the 24-month mandatory minimum sentence is "sufficient but not greater than necessary" to promote the goals of sentencing.

## A.   The § 3553(a) Factors

The sentencing court must consider "all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] must make an individualized assessment based on the facts presented." *United States v. Gall*, 552 U.S. 38, 128 S. Ct. 586, 596-97 (2007), *citing United States v. Rita*, 551 U.S. 338, 127 S. Ct. 2456 (2007). After considering all the relevant factors, the court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a). We respectfully submit that these goals are best served by the imposition of a sentence no greater than the mandatory minimum term of imprisonment.

1.   The Circumstances Under Which the Offense Occurred

In 2010, after Ms. Dumitru finally succeeded in passing the bar, she opened a general law practice, willing to take on whatever legal business came her way. She did not specifically

hold herself out as an immigration lawyer. However, as more and more clients came in looking for asylum, she did not turn them away. She needed the business. As many solo or small firm practitioners will attest, not knowing when the next client will come through the door causes many sleepless nights. In addition, Ms. Dumitru shared a common heritage with her client pool and felt a sense of responsibility toward them. Ms. Dumitru was her family's lifeline – she kept the roof over their heads and food on the table. When her daughter was born, she was determined to provide her with the things that she did not have as a child, beyond just a reliably warm home during the winter. She took on an unmanageable amount of work and too many responsibilities, creating circumstances in which she allowed her judgment to lapse and justified shortcuts to keep her practice running. Ms. Dumitru is remorseful for her misdeeds and for sacrificing her integrity in pursuit of greater success.

2. <u>Ms. Dumitru's History and Characteristics</u>

The letters of support submitted by Ms. Dumitru's friends and family members on her behalf overwhelmingly speak to at least one of three qualities – her generous spirit, particularly when someone had a medical or financial need, her devotion to her daughter, and her perseverance.

a. *Acts of Generosity*

Many letters of support describe how Ms. Dumitru took on the role as caretaker in circumstances where someone was ill or had a financial need. One of the more striking examples is her relationship with her ex-husband's parents. She invited her former in-laws into her home even though it was barely large enough for her own family, and provided them with personal and financial assistance for more than 15 years. She paid their rent for three years after they moved out in 2006, and continued to provide support after she and Cristian

separated in 2013.  Cristian's mother, Ana Dumitru, recalls how Andreea was their "financial stability" and is grateful for the care Andreea extended to them over the years:

> Between 2003 and 2009 Andreea paid all our expenses, drove us to doctor appointments, and we lived with her in her apartment in Sunnyside, Queens ... Ever since we've known Andreea we have never had a disagreement or argument.  She was always very understanding and patient with us.  Andreea would always call insurance and doctors for us and drive us to [ ] appointments when needed as we are very sick.
>
> She was our financial stability…[s]he gave us everything we wanted and needed without a question she always came prepared and never refused us.

Letter of Ana and Mihai Dumitru, Exhibit A.  Ana writes that Andreea and Cristian's divorce did not alter their relationship, and describes her as like "their own daughter."  *Id.*

Ms. Dumitru's acts of generosity went beyond her immediate family. Alexander Danil, a relative of Ms. Dumitru, relays that Ms. Dumitru helped care for his mother "by getting her medication or bringing her to a doctor's appointment."  Letter of Alexander Danil, Exhibit B.  Mr. Danil writes that, in addition, Ms. Dumitru helped his 94-year-old mother to regain her social security benefits "after being unjustly stopped…."  *Id.*

Other letters describe how Ms. Dumitru reciprocated the support she received from the Romanian community by accepting clients regardless of their ability to pay.  Nicolae Radu, Ms. Dumitru's friend and client, writes, "[u]nderstanding that some in our community could not afford high legal bill, Andreea would work with us to come to arrangements that we could manage."  Letter of Nicolae Radu, Exhibit C.  Another longtime friend writes that she "[has] seen [Ms. Dumitru] extend compassion to those experiencing financial difficulties by providing legal counsel without compensation."  Letter of Ion Panaitescu-Neata, Exhibit D.  *See also*, Exhibit P at p. 5 (Popa Letter), p. 7 (Zicu Letter),

Ms. Dumitru's fiancé, Sorin Ghisoiu, describes how Ms. Dumitru would not close her law practice until she secured another position for her one of her employees:

> One of Andreea's main concerns and the reason why she had postponed [closing the office] was that [*sic*] fact that Ana, her assistant, would have remained without a job. What she did was to reach out to people in her professional network, made phone calls or write emails, and she didn't stop until she found another office job for her assistant.

Letter of Sorin Ghisoiu, Exhibit E.

   b. *Ms. Dumitru's Perseverance*

Ms. Dumitru was raised in a country where one had to "make do" and "do what you need to do" in order to get by.  This became an instinct by which she navigated life.  She chose law school in Romania not because she was interested in the law but because it was her best prospect of supporting herself.  She opened her own translation business because, as a Romanian immigrant, she had few other skills by which to produce a livelihood.  She repeatedly sat for the bar exam until she passed because a law practice was the only foreseeable path to obtaining the income she needed in order to provide a better life for her daughter than the one she had in Romania.  As her close friend Mircea Panaitescu relates in his letter to the Court:

> Andreea has truly done her very best to ensure her daughter will…succeed in this world.  This rings especially true for those of us who are immigrants here raising children…hoping they have better prospects for their futures than we could… provide[] them in our home countries.

Letter of Mircea Panaitescu, Exhibit F.  Victoria and Christian Gheorghias, who are godparents to Ms. Dumitru's daughter, express the same sentiments:

> Over the years we have watched Andreea work incredibly hard to provide for her daughter ▮▮▮ the opportunities which were not available in her own childhood. As parents and immigrants

> ourselves, we relate intimately with this sentiment. Working long hours while raising a daughter and studying for the bar exam was no easy task, but for Andreea there was no[] question what had to be done.

Letter of Victoria and Christian Gheorghias, Exhibit G. Daniel and Cerasela Pana, who have known Ms. Dumitru from the community for twenty years, write, "We have known Andreea as an honest, hard-working, very ambitious individual who continued her education, furthered her career, all while being a dedicated mother and a great help to her family, clients, and friends." *See* Letter of Daniel and Cerasela Pana, Exhibit H.

      c. *Ms. Dumitru's Devotion to Her Daughter*

Although she was frequently consumed by work commitments, Ms. Dumitru's priority was always her daughter's upbringing and today they are the closest of friends. Several letters of support speak of Ms. Dumitru's devotion to █████ and express admiration of their relationship. Cristina Minovici, a friend for more than 18 years, writes that "[a]s we both became mothers months apart, we spent more time together and I had the chance to witness the attachment and love Andreea has for her only daughter, █████ Letter of Cristina Minovici, Exhibit I. She describes Ms. Dumitru as a "wonderful and caring woman; an excellent caretaker and a real friend to her child." *Id.*

Delia García, who tutored █████ from third through sixth grade, writes that Ms. Dumitru always took time "to discuss █████ progress in school and to keep up with alternatives in how to improve her daughter's reading and writing skills…She would always motivate █████ to work harder, to stay focused, to give the 100% and to never give up …." Letter of Delia García, Exhibit J. Ms. Dumitru's friend, Melinda Marcuse, also notes that after █████ was born, "Andreea continued her career but all-the-while paid the strictest of attention to raise █████ with the best possible education available… work[ing] all the harder

to afford whatever tutoring and extra held [*sic*] her daughter needed, but…with no complaints and [] proud that her daughter would benefit from being a first generation American." Letter of Melinda Marcuse, Exhibit K.

Pericle Gheorghias, Victoria and Christian's son, sees ███ as a reflection of Ms. Dumitru's good qualities: "For proof of her character, one need look no further than [Ms. Dumitru's] daughter ███ While working tirelessly to provide for her family, Andreea has also managed to raise a responsible and respectful young lady who exhibits a sense of awareness and moral character …." Letter of Pericle Gheorghias, Exhibit L.

Paul Cynamon, Ms. Dumitru's neighbor of more than 15 years, has a daughter who is a couple of months older than ███ The friendship between their daughters brought the families together, and Mr. Cynamon came to know Ms. Dumitru as a caring and involved parent:

> The Andreea Dumitru that I know is a mom who got her daughter off to school in the morning, went to work, and was with ███ nights and weekends. Our daughters attended ██████████████ together, a ████████████████ … If ███ was in a show, some type of presentation or parent-teacher conference day, I would see Andreea there. My wife and I helped put together fundraising playbill-like journals for the ███ school plays, as well as for a local dance school, and a local not for profit Sunnyside sewing school whose students put on annual fashion shows. Any time we asked, Andreea contributed, brought food, took ads in journals. When our PTA started hosting potluck Teacher Appreciation lunches to coincide with parent-teacher conferences, Andreea donated trays of food.

Letter of Paul Cynamon, Exhibit M.

Collectively, the letters of support portray Ms. Dumitru as someone who cherishes her interpersonal relationships, who treats friends as family and who is deeply connected to her community. During the nearly six months that she has been incarcerated at the Metropolitan

Correctional Center, she has been collaborating with several other inmates on a "cookbook" of creative recipes that can be crafted from the food items available at the facility.  She has also used the time to reflect on how she lived her life in the years prior to the instant offense and how it led her to this sad juncture.  Rather than lament her circumstances, Ms. Dumitru has already started the work of rehabilitation by finding ways to effect positive change both internally and around her.

3. <u>The Need for the Sentence Imposed (a) to Reflect the Seriousness of the Offense, to   Promote Respect for the Law, and to Provide Just Punishment for the Offense; (b) to Afford Adequate Deterrence to Criminal Conduct; and (c) to Protect the Public from Further Crimes of the Defendant</u>

A significant term of imprisonment is not necessary to promote the goals of sentencing. Ms. Dumitru has been disbarred from the practice of law in New York State and, as a convicted felon, will be unable to obtain another professional license.  Her reputation has been damaged before her friends, her family and the Romanian community where she has lived for more than two decades.  Most significantly, she will be separated from her teenage daughter and fiancé for a minimum of two years.   These consequences are a significant punishment that she is certain to endure.

Ms. Dumitru is also considered at very low risk for recidivism, according a 2017 report by the United States Sentencing Commission entitled "The Effects of Aging on Recidivism Among Federal Offenders" (the "Report").  The Report notes that recidivism information is "central" to the three objectives of sentencing that focus on "prevention of future crimes through correctional intervention," which are specific deterrence, incapacitation, and rehabilitation.  *See* Report at p. 2.  The Report analyzed 25,431 offenders sentenced under different Guidelines provisions and found that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release." *Id.* at pp. 2-3.

The Report also concluded that recidivism rates: decreased with "every step of education achievement"; was lower for females than males; increased with the Criminal History Category of the offender; and was higher for offenders in a "minority" demographic. *Id.* at 30.  All of these factors indicate that Ms. Dumitru is among the least likely to recidivate, including that she is in criminal history category I, will be over 45 years of age at the time of release and has a post-graduate degree.

The fact that Ms. Dumitru must serve a mandatory minimum as a result of her conviction promotes general deterrence.  A research report by The Sentencing Project entitled "Deterrence in Criminal Justice" (2010)[9] published key findings from criminological research on deterrence spanning several decades and across various nations. The studies all generally concluded that "enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." *Id.* at 4.  The deterrent effect is arguably stronger in a case where, as here, the mandatory minimum is not  quantity-based and can be triggered upon a single occurrence of the offense.   Research also found a "greater likelihood" that incarceration will more negatively affect low-risk offenders like Ms. Dumitru, and that "[low-risk offenders ] who spent less time in prison were 4% less likely to recidivate than [those] who served longer sentences." *Id.* at 7.  For all of the above reasons, a sentence to the mandatory minimum will be sufficient to promote the objectives of § 3553(a)(2)(C).

---

[9] Valerie Wright, Ph.D. *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT (2010) *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf

4. The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

There is no need in this case for educational, vocational or other correctional treatment. Ms. Dumitru holds a law degree from Romania, and a Masters in Law from Benjamin N. Cardozo School of Law. She built both a translation businesses and law practice through her resourcefulness and a dogged work ethic. Prison programs are unlikely to allow Andreea to excel beyond the level of skill she has already achieved.

5. The Kinds of Sentences Available; the Kinds of Sentence and the Sentencing Range Established for the Applicable Category of Offense

Ms. Dumitru's conviction for aggravated identity theft subjects her to a two-year mandatory minimum to run consecutive to any term of imprisonment imposed by the Court. There is no mandatory minimum for the other counts of conviction.

6. The Need to Avoid Unwarranted Sentence Disparities, to Provide Restitution to Any Victims, and Any Pertinent Policy Statements

There are no co-defendants in this case. From a review of other factually similar cases, it is clear that a sentence to the mandatory minimum will not result in an unwarranted sentencing disparity.

In *United States v. Lin*, 12 Cr. 936 (S.D.N.Y 2012)(Patterson, J.), the defendant, Liying Lin, was sentenced to three years' probation after a jury convicted her of conspiracy to commit immigration fraud and submitting false statements to the immigration service. Lin, a church deacon in Queens, coached immigrants on how to falsely seek asylum by claiming persecution in China for their religious beliefs, supplied the applicants with false details for

their asylum applications, and served as a translator during the asylum interviews, signaling to the applicants if they provided the "wrong" answer.[10]

In a related case, *United States v. Feng Ling Liu*, No. 12 Cr. 934 (S.D.N.Y. 2012)(Abrams, J.) two lawyers and a paralegal were convicted by a jury of conspiracy to commit immigration fraud for creating and submitting thousands of asylum applications falsely claiming persecution on behalf of Chinese immigrants.[11]   Liu, an attorney who operated the scheme through two law firms and was characterized as the "owner and leader of *the most prolific asylum fraud mill*" identified in the investigation, had a Guideline's range of 63-78 months and was sentenced to 60 months' imprisonment.  *See* No. 12 Cr. 934 at Dkt. 383, 412.  Bandrich, an attorney who initially worked for Liu before continuing the fraud through her own law firm, had a Guideline's range of 51-60 months' imprisonment and was sentenced to one year and one day.  *See* No. 12 Cr. 934 at Dkt. 403, 418.

Lastly, in 2016, a jury convicted immigration attorney Robert DeKelaita of conspiracy to commit asylum fraud, submitting false information in asylum applications and procuring perjury during asylum interviews. *United States v. DeKelaita,* No. 14 Cr. 497 (N.D. Ill. 2016)(Kennelly, J.). Over the course of eleven years, DeKelaita "prepared and submitted asylum applications that contained material lies, including tales of rape, murder, torture,

---

[10] *See* U.S. Attorney's Office, S.D.N.Y. "Liying Lin Found Guilty Of Immigration Fraud Offenses Following One Week Jury Trial In Manhattan Federal Court," *available at* https://www.justice.gov/usao-sdny/pr/liying-lin-found-guilty-immigration-fraud-offenses-following-one-week-jury-trial (last updated May 18, 2015).

[11] *See* U.S. Attorney's Office, S.D.N.Y. "Two Lawyers And Office Worker Convicted Of Immigration Fraud Offenses Following Jury Trial In Manhattan Federal Court," *available at https://www.justice.gov/usao-sdny/pr/two-lawyers-and-office-worker-convicted-immigration-fraud-offenses-following-jury-trial* (last updated May 18, 2015).

kidnappings, bombings and other forms of religious oppression in the Middle East."[12]  Several clients were granted asylum and eventually obtained citizenship.  *Id.*  DeKelaita was sentenced to 15 months' imprisonment.

The 24-month sentence recommended by the Probation Department would result in a total sentence of 48 months after the consecutive two-year mandatory minimum that Ms. Dumitru must serve for her conviction of aggravated identity theft, a charge that was added less than two-months before the start of trial and could have easily applied in the above cases.[13] With the exception of Feng Ling Liu, whose fraudulent scheme was significantly broader in scope and impact, a term of 48 months' imprisonment would be far greater than those imposed in similar cases.

7.  The Appropriate Sentence

The Sentencing Guidelines calculation is set forth above.  If the court adopts our calculation, Ms. Dumitru's total offense level is 15, with a Guideline range of 18 to 24 months. The instant offense was a gross deviation by an otherwise responsible, caring and hard-working individual who made many sacrifices to support her family.  Svetlana Schreiber, a long-time friend and attorney who is also Romanian-born, writes, "I have only known Andreea as a deeply caring individual, as a superb mother and as a zealous advocate.  Unlike

---

[12] *See* U.S. Attorney's Office, N.D. Ill. "Jury Convicts North Suburban Lawyer of Immigration Fraud for Falsifying Clients' Applications for U.S. Asylum," *available at https://www.justice.gov/usao-ndil/pr/jury-convicts-north-suburban-lawyer-immigration-fraud-falsifying-clients-applications* (last updated May 6, 2016).

[13] According the U.S. Sentencing Commission, the use of section 1028A mandatory minimum penalties "as a prosecutorial tool" has steadily increased.  In the last eight years, "the percentage of identity theft offenders convicted under section 1028A increased by nearly ten percentage points, from 42.6 percent to 53.4 percent (and more than doubled since the Commission began collecting data on these offenses in fiscal year 2006)." *See* U.S. Sentencing Commission. "Mandatory Minimum Penalties for Identity Theft Offenses in the Federal Criminal Justice System." (September, 2018).

me, Andreea...grew up in a country without ethics, without compassion, without concern, without heart...I truly believe [her] predicament is based on poor judgment rather than greed." Letter of Svetlana Schreiber, Exhibit N.

The letters of support consistently describe Ms. Dumitru as having the qualities to begin a positive, meaningful, productive and law-abiding life anew after she completes her sentence. In the words of her friends of 20 years, Victoria and Christian Gheorghias:

> It is difficult to describe the compounded sense of remorse Andreea feels at the moment. For the mistakes she has made, and for the situation in which she has put ███ To the extent of her control, [we are] confident that she will dedicate her future to righting the wrong she has done and starting on a new path with a clearer vision. The only question now is when she can begin.

Ex. G.

## B.   The Court Should Grant a Downward Variance in Light of Ms. Dumitru's Family Circumstances

Since *Booker* restored the courts discretion in sentencing, many judges have employed the § 3553(a) factors to vary downward in light of a defendant's family circumstances. Ms. Dumitru's incarceration will undoubtedly have dire emotional and psychological consequences for her 15-year-old daughter, ███ Unlike many parents of teenagers, who simply exist to provide meals, clean clothes and impose a curfew, Ms. Dumitru shares a true friendship with ███ They regularly spent time together on weekends, unwinding over a manicure or going on a shopping excursion while sharing stories from their school and work weeks. Ms. Dumitru's sudden incarceration at the conclusion of trial has left ███ devastated and anxious about her future. As she expresses in her letter:

> It has been really hard with my mom not home. Every morning when I would wake up and get ready for school, she would always be in the living room drinking her coffee and reading the bible and she would

> always give me a good morning hug…[L]ater on she would come home
> and we would have a long conversation about what our days looked
> like.  Without her home it's not the same.  I miss her more every day.
> She is my support and I need her the most right now in my teenage
> years, when I have so many decisions to make and someone to guide
> me and show me the right path.

Letter of ███ Dumitru, attached as Exhibit O.  Andreea's fiancé Sorin has also witnessed the effect of Ms. Dumitru's incarceration on her daughter:

> I can tell that the sudden and unexpected interruption of family
> ties has been the most harmful thing coming out of this
> conviction,  followed  by  her  immediate  incarceration.  Her
> daughter, ███ is confused, unfocused in school, and unable to
> understand what's happening to her mom, who's been the center
> of her universe so far.

Ex. E.

███ is not close with her father.  As she states in her letter to the Court: "We don't get along well, and I feel like he never understands me or never tries to do so.  He is an alcoholic, he smokes in the house and he only cares about himself…I would not be able to live with my father." Ex. O.  Although ███ alternated living with her mother and her father, she often complained to her mother that her father's apartment was dirty and unkempt. ███ who started living with Ms. Dumitru full-time last summer, remained with Mr. Ghisoiu after her mother was remanded in November and only recently returned to live with Mr. Dumitru.

Ms. Dumitru has also been ███ sole provider since she and Cristian divorced in 2014.  Although Mr. Dumitru owns and operates ACAD, he has had financial difficulty in recent years and has not contributed any child support.  ███ recalls that last summer, her father lost his apartment after he was unable to pay his rent and moved in with his girlfriend. Exhibit O.  ███ is presently a ███ at ███, a ███ ███

high school on ███████████████████ where students must audition in order for admission.  Ms. Dumitru's inability to provide financial support for ████ over the next two years will affect her options for furthering her education and career.

A long sentence might also deprive Ms. Dumitru from an opportunity to see her mother again.  Mrs. Parcalaboiu, who lives in Romania, suffered a prolonged and severe depression after the deaths of her longtime partner and three close friends all occurred within a short period of time.  For the past five years, she has been housebound and needs a walker to ambulate.  Mrs. Parcalaboiu's only opportunity to see her daughter and granddaughter is when they visit during their summer months.  Ms. Dumitru's longtime friend, Cristina Minovici expresses her concern that because Ms. Dumitru's mother is unable to travel "it is very likely that her disable[d] mother will not survive to see her one last time and likely she will die alone."  Ex. I.

While the above circumstances are perhaps not extraordinary or atypical among defendants, they connote serious consequences for Ms. Dumitru's daughter that can be ameliorated by sentencing Ms. Dumitru to the mandatory minimum.

Lastly, as Judge Chin wrote regarding the role of empathy in sentencing, "without hope a defendant has little reason to want or try to do better."  *See* Denny Chin, *Sentencing: A Role for Empathy*, U. PA. L. REV. 1561 (2010).  A sentence to the mandatory minimum will provide Ms. Dumitru with hope that she can see ████ graduate from high school and support her as during a significant transition period in her life.

## CONCLUSION

The Court's primary concern must be to impose a just sentence, one that comports with the directive of parsimony in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary to comply with the purposes [of sentencing]."  For the foregoing reasons, we submit that a sentence to the two-year mandatory minimum is fair and just, advances the goals of sentencing and provides Ms. Dumitru, her daughter and fiancé hope for a future as a family.

Respectfully submitted,

By: /s/ Jeffrey C. Hoffman
　　　Jeffrey C. Hoffman

WINDELS MARX LANE
& MITTENDORF LLP
156 West 56th Street
New York, New York 10019
Tel: 212.237.1018
Fax: 212.262.1215
jhoffman@windelsmarx.com

*Attorneys for Andreea Dumitru*

On the Brief:
Diane Fischer, Esq.
Susan C. Wolfe, Esq., *Of Counsel*