

Jeffrey C. Hoffman
212.237.1018
jhoffman@windelsmarx.com

156 West 56th Street | New York, NY 10019
T. 212.237.1000 | F. 212.262.1215

May 6, 2019

**VIA ECF**

Hon. Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: <u>United States v. Andreea Dumitru, 18-cr-243 (LAK)</u>

Dear Judge Kaplan:

Please accept this letter as Ms. Dumitru's Reply to the Government's Sentencing Letter ("Govt. Ltr."), and in further support of the arguments in Ms. Dumitru's previously submitted Sentencing Memorandum ("Def. Memo").

The purpose of this Reply is to clarify the government's mischaracterization of Ms. Dumitru's argument regarding a sentencing enhancement; to provide the Court with information regarding in the government's allegations that she participated in a tax fraud; and to respond to the government's request for an order of forfeiture in the amount of $157,500.

I.    The Enhancement for 100 or More Fraudulent
      Documents Should Not Be Applied

The government misconstrues the argument in Ms. Dumitru's initial submission. *See* Def. Memo, Section III(B)(1). Special Agent Posilkin testified that he analyzed 105 applications, comprised of the following government exhibits: GX 600-610; GX 612-634; GX 636-674; GX 675B; GX 676-702; GX 703D; GX 704B; GX 706-707. Tr. 592.[1] We do not dispute that Posilkin analyzed 105 applications. However, in order to prove that 105 applications contained a false statement, each and every exhibit number within the aforementioned list of exhibits would need to appear on the government's Summary Charts, GX 816 and/or GX 817. They do not. The first page of the Summary Charts shows the total number of times each of the individual "false narratives" appeared within the 105 applications. The second page of the Summary Charts lists the specific exhibit numbers in which each of the individual false

---

[1] References to "GX" correspond to the government exhibit number(s). References to "Tr." correspond to the page(s) of the official trial transcript.

{11696945:1}



narratives appeared. Five applications do not appear on either Summary Chart (GX 632, GX 633, GX 637, GX 679 and GX 680 (the "missing exhibits")).[2]

The missing exhibits are not, as the government states, immaterial to consideration of this enhancement. First, the government maintains, based on Posilkin's testimony, that all 105 asylum applications contained a "false narrative" when, according to his charts, five of them did not. Tr. 593-595. Second, in order for the enhancement to apply regardless of the missing exhibits, *all* of the remaining exhibits must have contained a false statement. Posilkin testified that he did not personally interview the 105 asylum applicants or otherwise participate in the investigation. Tr. 619. Posilkin also testified that he reviewed only the narrative section of the application. Tr. 622-623. Posilkin's limited analysis cannot foreclose the possibility that at least *one* of the applications contained true statements about the applicant's experiences and cannot therefore support a finding by preponderant evidence that 100 or more applications contained false statements.

The government also argues that Alexandra Miron's testimony makes this case analogous to *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999). The contrary is true. In *Walker*, the office employee testified that he "had helped to fill in the details on a backlog of over a thousand asylum applications, selecting accounts of persecution from a collection of stories that the office kept in a drawer." 191 F.3d at 332. Miron, on the other hand, testified that she "didn't keep count" before estimating that it was "probably over a hundred" applications. Tr. 332. Miron also demonstrated that her estimates were unreliable. When asked how many applications Dumitru filed each year, she testified that she "didn't keep track, but probably [] anywhere from 50 to a hundred." Tr. 327. An "estimate" where the high end is double the low end is only the roughest of estimates. If Miron's "50 to 100" estimate is the precision with which she can estimate over a *one*-year period, one cannot reasonably rely on her estimate over a *three*-year period. Finally, the testimony in *Walker* involved thousands of applications, more than tenfold the amount required for the enhancement to apply. In this case, the government's evidence hovers shakily over the threshold. Miron's estimate of the number of false applications cannot support the sentencing enhancement for 100 or more documents.[3] The government has, at most, preponderant evidence that the four applications of the cooperating client witnesses contained false statements. There is no enhancement under U.S.S.G. § 2L2.1(b)(2) if the offense involved six or fewer documents.

---

[2] Undersigned counsel provided the missing exhibit numbers to the government, conceded that we erroneously said that there were eight, not five, in our initial submission and further attempted to clarify our argument prior to the government's sentencing submission.

[3] The 105 applications analyzed by Posilkin included those of the cooperating client-witnesses: GX 653 (Ovidiu Bangau); GX 704B (Richard Tcaciuc); GX 607 (Suedin Chiciu); GX 703D (Cosmin Cozma).

{11696945:1}


Hon. Lewis A. Kaplan
United States District Judge
May 6, 2019
Page 3

II. The Government Does Not Have a Sufficient Basis to Seek Forfeiture in the Amount of $157,500

The government moves for a final order of forfeiture pursuant to 18 U.S.C. § 982(a)(6) and Fed. R. Crim. P. 32.2(b)(4). *See* Govt. Memo at p. 10 and Exhibit 3. The government seeks a money judgment for $157,500, on the theory that there were 105 false applications filed and that each applicant paid $1,500. *Id.* The government did not offer sufficient proof of either the quantity of false applications, the number of applicants who paid a fee or the amount each applicant paid. Its request should be denied.

"Criminal forfeiture under section 982 is a form of punishment, separate and apart from any restitutive measures imposed during sentencing." *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2740 (2014). As part of the sentencing process, the government must prove any facts supporting the forfeiture by a preponderance of the evidence. *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) *citing United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999). For the reasons cited in Section I of this letter and in Def. Memo. Section III (B)(1), the government has not proven that the offense involved more than 100 false application.

In addition, the government must prove "by a preponderance of the evidence that the amount of money or property to be forfeited was derived from proceeds traceable to the fraud." *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) *citing United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005). *See also* 18 U.S.C. § 982(a)(1). The evidence at trial is insufficient to determine the number of applicants who paid Ms. Dumitru to submit an asylum application and the amount each paid. The only evidence of money paid to Ms. Dumitru in this connection came from the testimony of the four client witnesses, Bangau, Tcaciuc, Chiciu, Cozma.

The government did not seek a preliminary order of forfeiture in the amount of the requested money judgment prior to filing its sentencing submission. *See* Fed. R. Crim. P. 32.2(b)(1)(A). To date, it has not identified the substitute assets, if any, it believes are subject to forfeiture. In the event the Court determines that an order of forfeiture is warranted, we ask that the order be preliminary and that counsel be permitted 30 days to prepare a response.

III. Ms. Dumitru's Involvement in Tax Fraud

The government, incredibly, accuses Ms. Dumitru of "misleading" the Court regarding her life circumstances at the time of the offense and for failing to "take responsibility for her conduct in any meaningful way." Govt. Memo p. 9. The government's basis for this claim is



that Ms. Dumitru, while describing that she was under the strain of a second job at the time of the offense, failed to mention her involvement in a tax fraud scheme with her employer Evgeny A. Freidman. *Id.* The government cites this as "conclusive evidence" that perpetrating fraud is "the foundation of her career." *Id.* On the contrary, Ms. Dumitru disclosed that she relied heavily on her income from Freidman's company to support her family. Def. Memo at 5-7. When, for a brief period of time, she left Freidman's employ, she quickly found that she could not sustain herself and her family on her law practice
income and had to return. *Id.*

Ms. Dumitru's acquiescence in the scheme was also as result of the environment she worked under. Freidman's contemptuous and domineering personality has been well documented by the media[4] and, as Ms. Dumitru recalls, employees feared challenging him. He was verbally abusive to his employees and Ms. Dumitru was no exception. Ms. Dumitru reaped no benefit from this scheme, apart from keeping her position and salary. She has taken responsibility for her conduct and has fully cooperated with the New York State Attorney General's Office in their related civil investigation.

Criminal conduct does not take place in a vacuum. The context in which the conduct occurred is unquestionably relevant to the sentencing process, as Judge Chin noted while discussing the importance of empathy in sentencing:

> [B]y empathy I mean the capacity to understand and appreciate the perspective of others, whether that perspective is of individuals trying to 'make a living or care for their families' or corporations required to defend themselves against frivolous claims brought by vexatious litigants. We were selected as judges because of our experiences in life, and because the wisdom, good judgment and sense of justice that hopefully we have developed as a result of those experiences.[5]

---

[4] In June, 2018, Friedman was ordered to pay $1.3 million in damages to his former assistant for repeated sexual harassment. The assistant worked at Taxi Cab Management for a mere seven months. *See* Steven Hirsch, 'Taxi King' must pay $1.3M to ex-assistant after sex harassment." NY POST, June 26, 2018, *available at* https://nypost.com/2018/06/26/taxi-king-must-pay-1-3m-to-ex-assistant-after-sex-harassment/

[5] *See* Denny Chin, *Sentencing: A Role for Empathy*, U. Pa. L. Rev. 1561 (2010).

{11696945:1}



Hon. Lewis A. Kaplan
United States District Judge
May 6, 2019
Page 5

 

Ms. Dumitru is not the person described in the government's sentencing submission. We submit that the fuller and more accurate picture is presented in the defense submission and in the report of Ms. Dumitru's psychological evaluation conducted by Ms. Silvia Dutchevici.[6]

Thank you for your consideration.

Respectfully submitted,

/s/Jeffrey C. Hoffman
Jeffrey C. Hoffman

cc: AUSA Robert B. Sobelman
AUSA Alison G. Moe
AUSA Nicholas Chiuchiolo

---

[6] Ms. Dutchevici's report and a request that it be filed under seal has been separately submitted to the Court.

{11696945:1}